IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAY A. LIBBEY,                          §
                                        §
        Plaintiff,                      §
                                        §
V.                                      §        CIVIL ACTION NO. H-07-362
                                        §
MICHAEL J. ASTRUE                       §
COMMISSIONER OF THE SOCIAL              §
SECURITY ADMINISTRATION,                §
                                        §
        Defendant.                      §

**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary

Judgment and Memorandum in Support (Document No. 6), and Defendant's Response to Plaintiff's

Motion for Summary Judgment and Motion for Summary Judgment (Document No. 7).   After

considering the cross motions for summary judgment, the administrative record, and the applicable

law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for

Summary Judgment (Document No. 7) is DENIED, Plaintiff's Motion for Summary Judgment

(Document No. 6) is GRANTED, and the decision of the Commissioner is REMANDED for further

proceedings.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on August 8,
2007.  (Document No. 10).

## I.  Introduction

Plaintiff, Jay A. Libbey ("Libbey"), brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for disability insurance benefits ("DIB").   According to Libbey, substantial evidence does not support the ALJ's decision, and the ALJ, Thomas G. Norman, committed errors of law when he found that Libbey had no severe impairments during the relevant time period, namely prior to September 30, 1995, the date he was last insured.  Libbey seeks an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding his claim for further proceedings.  The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Libbey had no severe impairments, that the decision comports with applicable law, and that it should, therefore, be affirmed.

## II.  Administrative Proceedings

On May 14, 2004, Libbey applied for disability insurance benefits claiming that he has been unable to work since May 25, 1989, as a result of hepatitis C, chronic pancreatitis, irritable bowel syndrome and chronic back pain. (Tr. 55-58). The Social Security Administration denied his application at the initial and reconsideration stages.  (Tr. 23, 24, 30-31).  After that, Libbey requested a hearing before an ALJ.  (Tr. 36-37).  The Social Security Administration granted his request and the ALJ held a hearing on June 6, 2006, at which Libbey's claims were considered *de novo*.  (Tr. 198-223).  On August 7, 2006, the ALJ issued his decision finding Libbey not disabled. (Tr. 10-19).  The ALJ found at step one that Libbey was insured for DIB through September 30, 1995, and that Libbey had not engaged in substantial gainful activity since his alleged disability onset

date, May 25, 1989.  The ALJ found Libbey's testimony concerning his subjective symptoms and functional limitations not wholly credible or supported by the record.  At step two, he found that Libbey had no severe impairment(s), and that he, therefore, was not disabled within the meaning of the Act.

Libbey sought review by the Appeals Council of the ALJ's adverse decision.  (Tr. 8-9).  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R.      § 404.970, 416.1470.  After considering Libbey's contentions, in light of the applicable regulations and evidence, the Appeals Council concluded, on December 1, 2006, that there was no basis upon which to grant Libbey's request for review.  (Tr. 3-5).  The ALJ's findings and decision thus became final.

Libbey timely filed an appeal of the ALJ's decision denying his application for DIB.  42 U.S.C. § 405(g).  Libbey has filed a Motion for Summary Judgment and a Memorandum in Support (Document No. 6), to which the Commissioner has filed a Response and Motion for Summary Judgment.  (Document No. 7).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 223 (Document No. 5).  There is no dispute as to the facts contained therein.

### III. Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is, only: "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a

4

suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

Here, the ALJ found at step two that Libbey has no severe impairment(s) on or before the date he was last insured on September 30, 1995, and was therefore not disabled within the meaning of the Act.  In this appeal, the Court must determine whether substantial evidence supports the ALJ's step two finding.

According to Plaintiff, substantial evidence does not support the ALJ's step two finding that he had no severe impairment(s) during the relevant time period, namely prior to September 30, 1995,

the date he was last insured for DIB.  According to Libbey, there is no evidence in the record that he suffered from only non-severe impairment(s) as found by the ALJ and there is no evidence that his condition has improved.

In response to Libbey's arguments, the Commissioner contends that substantial evidence supports the ALJ's decision.  According to the Commissioner, Libbey has not sustained his burden of establishing a disabling condition before the expiration of his insured status.  The Commissioner submits that the testimony of Dr. Talmage confirms that Libbey had some discogenic pain but no disc herniation, and that his pain was remediable as shown by Libbey's favorable response to neurolytic hypertronic saline epidural injections, zygapophyseal joint injections, and radio frequency neurolytic zygapophyseal joint nerve injections.  The Commissioner further argues that Dr. Chang's medical findings do not support Libbey's claim of a severe impairment.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren,* 925 F.2d at 126.  Any conflicts in the evidence are to be resolved by the ALJ, and not the Court.  *see Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000)(citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

Here, at step two, based on the medical evidence, Libbey's testimony and the testimony of Dr. Talmage, Libbey's treating physician from 1989 through 1990, the ALJ concluded that Libbey had no severe impairments or combination of impairments, which have lasted or which could last for 12 continuous months prior to the expiration of his insured status. The ALJ wrote:

7

The Administrative Law Judge reviewed the evidence and finds that the claimant's impairments, singly or in combination, have not been "severe" for at least 12 consecutive months as required by the Act. Specifically, his impairments do not more than slightly limit his ability to perform basic work-related activities. (20 CFR 404.1521(b). In reaching this conclusion, the Administrative Law Judge considered the claimant's subjective complaints in light of Social Security Ruling 96-7p and 20 CFR 404.1529 and 416.929.

Section 5.05, Appendix 1, Subpart P, Regulations No. 4, allows for a presumption of disability when there is evidence of chronic liver disease with (A) esophageal varices with other required findings; or (b) performance of a shunt operation for esophageal varices; or (C) serum bilirubin of 2.5 mg. per deciliter (100 ml.) or greater persisting on repeated examinations for at least 5 months; or (D) ascites, not attributable to other causes, recurrent or persisting for at least 5 months, demonstrated by abdominal paracentesis or associated with persistent hypoalbuminemia of 3.0 gm. per deciliter (100 ml.) or less; or (E) hepatic encephalopathy which is then evaluated under another medical listing; or (F) confirmation of chronic liver disease by liver biopsy and one of the following: (1) ascites not attributable to other causes, recurrent or persisting for at least 3 months, demonstrated by abdominal paracentesis or associated with persistent hypoalbuminemia of 3.0 gm. per deciliter (100 ml.) or less, or (2) serum bilirubin of 2.5 mg. per deciliter (100 ml) or greater on repeated examinations for at least 3 months, or (3) hepatic cell necrosis or inflammation, persisting for at least 3 months, documented by repeated abnormalities of prothombin time and enzymes indicative of hepatic dysfunction.

A review of the medical record established that the claimant has hepatitis C, pancreatitis or irritable bowel syndrome. However, there is no medical evidence that the claimant sought treatment for hepatitis C, pancreatitis, irritable bowel syndrome until April 21, 1995 **(six years subsequent to the alleged onset date)**, when the claimant complained of occasional diarrhea and dysphagia involving the upper esophagus (Exhibit 1F, page 12). A colonoscopy performed in May 1995, confirmed irritable bowel syndrome and internal hemorrhoids. However, a biopsy of the abdomen demonstrated no histologic abnormalities (Exhibit 1F, pages 4 and 6).

Also, an examination performed in June 1995 indicates that the claimant's abdomen was soft, flat and non-tender with positive bowel sounds. He also denied having any problems with urinary or bowel incontinence (Exhibit 2F, pages 3-4). A follow up visit in June 1995 indicates that the claimant reported only occasional reflux symptoms (Exhibit 1F, pages 4 and 6).

**As noted, the claimant's insured status expired on September 30, 1995.** Subsequent treatment notes by Dr. Marvin C. Chang dated December 1995 and February 1996 refers to residual complaints of chronic abdominal pain secondary to

8

hepatitis C.  However, it was the opinion of Dr. Chang that the claimant continued to do well in regards to his liver disease (Exhibit 6F, page 37).  Also, during follow up visits in June 1996 and May 1997, the claimant reported doing overall well from his gastrointestinal status.  He also denied having any significant problems with pancreatic pain (Exhibit 6F, pages 33 and 37).

Additionally, treatment notes dated November 2003 and September 2004 indicates the claimant doing very well from his hepatitis C with only intermittent hepatitis problems following completion of his interferon treatment in July 2003 (Exhibit 6F, pages 16-17).  Furthermore, subsequent treatment notes do not indicate the claimant being treated for hepatitis C, pancreatitis or irritable bowel syndrome, thus indicating that his hepatitis, pancreatitis and irritable bowel syndrome have been resolved.

Also, a review of the medical record of evidence established that the claimant has lumbar disc disease with chronic radiculitis.  However, there is no medical evidence of record prior to September 30, 1995, that the claimant's disorder of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), has resulted in compromise of a nerve root (including the cauda equina) or the spinal cord with:  (A) evidence of nerve root compression characterized by neuro anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (sitting and supine); or (B) spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or (C) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b so as to meet or equal the medical severity of the criteria under section 1.04 of the Listings of Impairments found in Appendix 1 to Subpart P of Regulations No. 4 for a finding of presumed disability.

The medical record reflects that Dr. Phillip M. Bellan's report dated June 15, 1989 indicates the claimant exhibited sciatica like pain with radiation into the right leg and foot but **without any neurological deficits**.  Dr. Bellan further reviewed an x-ray of the lumbar spine, which he stated was unremarkable and without evidence of any significant fracture, dislocation or other pathology noted.  Dr. Bellan's impression was that of acute lumbar strain with sciatica of the right leg (Exhibit 4F, page 47).

Dr. Edward Talmage's examination of the claimant in July 1989 showed that there was tenderness over the episacral nodules at L4-5 with positive dorsiflexion stretch

reflex on the right.  However, Dr. Talmage further reviewed [a] myelogram with CT scan of the lumbar spine, which he stated revealed no evidence of a herniated disc. Dr. Talmage's impression was that of an acute lumbar strain with nerve root irritation, probable epidural adhesions, and mechanical back pain with lumbar spondylosis (Exhibit 4F, pages 45-46).

Subsequent treatment notes by Dr. Edward Talmage during the period from September 29, 1989 through August 30, 1990 indicates that the claimant underwent physical therapy and lumbar epidural injections without improvement. As a result, Dr. Talmage recommended the claimant undergo a spinal cord stimulator placement for his back pain, **which he rejected** (Exhibit 4F, pages 1-36).

Finally, the medical record does not show the claimant having neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss nor evidence of a history of persistent joint and stiffness with signs of marked limitations of motion or markedly limiting the ability to walk and stand.

The claimant testified that in May 1989, he sustained a work related injury to his back. As a result, he developed low back pain with radiation into the right leg.  He was subsequently treated by Dr. Edward Talmage for his back pain.  Despite pain medication therapy and steroid injections, he continued to experience low back pain. However, such allegations do not comport with the July and August 1995 evaluations of Dr. Marvin C. Chang.  Dr. Chang specifically reported that the claimant was doing reasonably well following lumbar epidural steroid injections.  He also noted that a repeated MRI of the lumbar spine was found to be negative (Exhibit 2F).  Also, when seen in September and November 1995, the claimant reported only minimal low back pain following steroid injections and Dilaudid pain therapy (Exhibit 2F, page 1).

The claimant also testified that prolonged standing, sitting, and climbing exacerbated his pain.  However, during the hearing, the Administrative Law Judge had an opportunity to observe the claimant.  The claimant was appropriately dressed, his personality was pleasant, his gait and speed were normal, and he was able to ambulate, sit, and rise without signs of distress.  Additionally, the claimant did not indicate that he required assistive devices such as crutches, cane or walker when ambulating.  Furthermore, subsequent treatment notes indicate that the claimant reported doing reasonably fair in regards to his back pain (Exhibit 6F, pages 17-32).

The claimant also testified that in 1995, he was diagnosed as having hepatitis C secondary to cirrhosis of the liver.  Treatment notes dated November 2003 and September 2004 indicates the claimant doing very well from his hepatitis C with only intermittent hepatitis problems following completion of his interferon treatment in July 2003 (Exhibit 6F, pages 16-17).  Furthermore, subsequent treatment notes do not

indicate the claimant being treated for hepatitis C, thus indicating that his hepatitis has been resolved.

In support of the claimant's allegations, the claimant's treating physician, Dr. Edward Talmage testified that in July 1989, he began treating the claimant for low back pain. At that time, he was found to have tenderness over the episacral nodules area at L4-5, with positive dorsiflexion stretch reflex on the right side. A positive straight leg raising test at 80 degrees bilaterally was noted as well. He stated that deep tendon reflexes were present and equal. Dr. Talmage's impression was that of an acute lumbar strain injury with nerve root irritation, probable epidural adhesions, and mechanical back pain with lumbar spondylosis. However, he indicated that a myelogram/CT scan of the lumbar spine performed revealed no evidence of a herniated disc. Because the claimant exhibited discogenic pain without evidence of a herniated disc, he stated that a laminectomy was not recommended. As a result, he underwent lumbar epidugram on September 25, 1989 that showed epidural adhesions at L4-S1.

Dr. Talmage also testified that he last treated the claimant in August 1990. The claimant continued to complain of ongoing back pain. As a result, the claimant was recommended to undergo a spinal cord stimulator placement for his mechanical pain, **which he rejected** and instead elected to seek treatment with Dr. Marvin C. Chang.

Although Dr. Edward Talmage testified that during the relevant period, the claimant continued to suffer from chronic back pain, it should be noted that Dr. Talmage's treating relationship with the claimant was only as of July 1989 through August 1990.

The Regulations state that the claimant must provide medical evidence showing that he has an impairment(s) and how severe it is during the time that he says that he is disabled (20 CFR 404.1512(c) and 416.912(c)). There is no medical evidence of record during the relevant period of a "severe" impairment.

The Administrative Law Judge finds that the claimant may have some discomfort which, on occasion, may have become aggravated; however, the mere inability to work without pain or discomfort of a mild to moderate nature is not sufficient to establish "disability" for social security purposes. The medical evidence fails to demonstrate any anatomical or physiological abnormality that would account for the claimant's alleged impairments. It is therefore found that the claimant's allegations, as it relates to the severity of his condition, is not supported by the record as a whole, including the objective medical evidence. (Tr. 15-18). (emphasis in original).

11

The Court must determine whether substantial evidence supports the ALJ's step two finding.

## V.  Discussion

At step two, the claimant bears the burden of showing that he has a severe impairment or combination of impairments that significantly limits the claimant's physical or mental ability to do basic work activities.[2]  The step two requirement that the claimant have a severe impairment is generally considered to be "a de minimis screening device to dispose of groundless claims."  *Smoven v. Chater,* 80 F.3d 1273, 1290 ( 9th Cir. ) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-154 (1987)). Simply put, "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (quoting *Estran v. Heckler*, 745 F.2d 340, 341 ( 5th Cir. 1984); 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").  The ALJ must "consider the combined effects of all impairments, without regard to whether any such impairment, if considered separately, would be of sufficient severity."  *See Loza v. Apfel*, 219 F.3d 378, 393  (5th Cir. 2000); *Crowley v. Apfel*, 197 F.3d 194, 197  (5th Cir. 1999); 20 C.F.R. § 404.1523.  Even though the burden at step two lies with the claimant, the claimant need only make a minimal  showing to move

--------

[2] The ability to do most work activities encompasses "the abilities and aptitudes necessary to do most jobs."  *Williams v. Sullivan*, 960 F.2d 86, 88 (8th Cir. 1992).  Examples include physical functions such as walking, sitting, standing, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work situation.  *Id.* at 88-89; 20 C.F.R. § 1521(b).

to the next step in the five step sequential process.  With respect to a minimal showing, the mere presence of a condition is not sufficient to make a step two showing.  *See Bowen,* 482 U.S. at 153.

Here, the medical records show that Libbey has been diagnosed with hepatitis C, chronic pancreatitis or irritable bowel syndrome, and chronic back pain.

In May 1989, Libbey had an appointment with Dr. Phillip M. Bellan, at which he complained of low back pain radiating to his right leg.  Dr. Bellan noted that Libbey had "moderate distress with significant paralumbar spasm.  Straight leg raising was 75 degrees in both legs."  (Tr. 149).  Other than Libbey's sciatica-like pain, he had no neurological deficits.  Dr. Bellan also noted that X-rays were unremarkable.  (Tr. 149).  Dr. Bellan opined that Libbey had "acute lumbar strain with sciatica to the right leg."  (Tr. 149).  Because Libbey's pain complaints remained notwithstanding medication (Soma), extensive physical therapy, and use of a Tens unit, he sought treatment from Dr. Talmage.  His first appointment was July 7, 1989.  (Tr. 147-148).  Libbey's examination revealed:

> Neuromuscular Examination:  Reveals 2 + bilateral lumbosacral paravertebral muscle spasm with back motions limited to 60 to 70 % of normal.  Flexion to the extent possible causes 2 + aggravation of pain and spasm, and extension causes a lesser degree of increased spasm and pain.  Leg rotation is accompanied by pain and spasm to the extent possible, and left rotation causes a more severe increase in pain and spasm than the right rotation.  The patient is somewhat tender over the L4-5 interspace.  Episacral nodules are present bilaterally, with considerable tenderness to palpation on the right side.  There is decreased lumbar lordosis, with slight reversal of the normal curve.  Straight leg raising is positive at 80 degrees bilaterally, with 2 + dorsiflexion stretch reflex on the right, and a 1 + on the left.  These are referred to the lumbosacral area.  Patrick's test is negative.  Heel and knee test is 1 + on the right, and 2 + on the left.  Gaenslen's maneuver is 2 + on the right, and negative on the left.  Deep tendon reflexes are present and equal.  No major muscle group weakness is discernible.  There is decreased tactile sensation in the right lower extremity.

> Impression:  (1) Recent acute lumbar sprain injury with lumbosacral nerve root irritation and probable epidural adhesions mechanical back pain with lumbar spondylosis.  Possible chronic cervical sprain injury (by history).  (Tr. 148).

13

A nerve conduction study was performed on August 8, 1989 at the Houston Neurodiagnostic Clinic by Dr. F. William Nelson.  (Tr. 145-146).  The nerve conduction studies of the lower extremities were normal.  (Tr. 146).  In contrast, the "needle examination revealed mild acute and chronic denervation changes in the EDG muscles bilaterally, somewhat worse on the right."  (Tr. 146).  As such, Dr. Nelson opined:  "abnormal EMG suggesting L5-S1 root irritation bilaterally, worse on the right."  (Tr. 146).

Libbey had a follow up appointment with Dr. Talmage on September 8, 1989. (Tr. 144). Dr. Talmage diagnosed Libbey with "chronic lumbosacral sprain injury with chronic lumbosacral nerve root irritation; mechanical back pain with lumbar spondylosis."  Dr. Talmage noted that the myelogram and post-myelogram CT had not revealed any significant intradiscal pathology. (Tr. 144). Dr. Talmage opined that Libbey had "chronic ligamentous sprain type injury and epidural adhesions." (Tr. 144).

Libbey complained of low back pain and leg pain at his September 25, 1989, appointment with Dr. Talmage.  In response, Dr. Talmage recommended, for pain management, that Libbery undergo a trial of caudal lumbar epidural hypertonic saline injections.  (Tr. 142-143). Libby had injections on September 26, 1989, September 27, 1989, and September 29, 1989.  (Tr. 134-142).  Dr. Talmage performed a lumbosacral zygo-apophyseal joint nerve injection on October 20, 1989.  (Tr. 132-133). Libbey, again complaining of recurrent low back pain and leg pain and depression,  had an appointment with Dr. Talmage on December 4, 1989.  (Tr. 130-131).  The results of the physical examination showed:

> Neuromuscular:  2 + bilateral lumbosacral paravertebral back muscle spasm is seen. Back motions are limited to 70 to 80% of normal, with flexion possible with good reversal of the normal lumbar lordotic curve; however, extension in the seated

14

position is extremely painful, as is rotation, especially to the right, and these maneuvers are accompanied by severe pain and spasm, even when performed cautiously. The patient is tender over the L4-5 interspace, although not to the degree previously noted. There is episacral nodules present, with tenderness to palpation on the right side. Straight leg raising is possible to 85 degrees, bilaterally, and the dorsiflexion stretch reflexes are only trace positive at the present time. Deep tendon reflexes are preserved, and there is no other muscle group weakness or gross sensory defect noted.

Impression: 1) Continuing chronic lumbar sprain injury and chronic lumbosacral nerve root irritation and epidural adhesions, and mechanical back pain and lumbar spondylosis, accompanied by moderately severe psychiatric depression.

Treatment Plan: The patient is admitted at this time, in view of two previously successful zygo-apophyseal joint injection procedures, applying local anesthetic and steroid, for a definitive trail of zygo-apophyseal joint nerve rhizotomies. It appears that a considerable amount of his pain in coming from the sacroiliac area, as evidenced by the persistent, tender episacral nodules on the right side. The patient will also be seen by Dr. Royce Watts for evaluation of his psychometrics, and depressed state. He is currently on Desyrel for the depression, having switched from Sinequan because of excessive drowsiness while taking the Sinequan. (Tr. 130-131).

Libbey underwent the zygo-apophyseal joint rhizotomy by thermocoagulation neurolysis at L1-2, L2-3, L3-4, L4-5, L5-S1 and sacroiliac levels that had been recommended by Dr. Talmage. (Tr. 124-129).

The medical records for 1990 show that Libbey continued to be treated by Dr. Talmage. According to the January 4, 1990, treatment note, Dr. Talmage "discussed progress with patient. He still has the same symptoms as last time, but they are less severe." (Tr. 123). Similarly, Libbey reported "feeling good today" at his January 11, 1990, appointment (Tr. 121, 123), and again, at his January 16, 1990, appointment. (Tr. 120, 123). However, at his January 18, 1990, appointment, Libbey reported "throbbing pain in L4 & 5 into right leg." (Tr. 123). Libbey had another injection by Dr. Talmage on January 31, 1990. (Tr. 115-119). Libbey attended physical therapy January 25, 1990, January 29, 1990, February 15, 1990, February 22, 1990, February 27, 1990, March 8, 1990,

March 15, 1990, March 19, 1990, March 21, 1990, March 29, 1990, April 5, 1990, June 20, 1990, July 16, 1990.  (Tr. 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 122).

Because of Dr. Talmage's observations about Libbey's depressed state, Libbey was referred to a clinical psychologist, Royce A. Watts, Ph.D., who opined that Libbey had a "moderately severe adjustment reaction with symptoms of anxiety and depression."  (Tr. 114).

The medical records further show that in 1995 Libbey commenced treatment for stomach related problems including esophageal reflux, nausea, and chronic diarrhea with Dr. Michael Stavinoha.  His first appointment was May 1, 1995.  (Tr. 96).  Libbey's blood work and stool sample were normal (Tr. 91-95).  The results of an esophagogastroduodenoscopy with biopsy was normal. (Tr. 89, 90).  The EDG showed that Libbey had severe gastritis, reflux esophagitis, and a hiatal hernia.  (Tr. 89).  In addition, Libbey had a colonscopy on May 11, 1995, which revealed that he had irritable bowel syndrome and internal hemorrhoids.  (Tr. 88).  Libbey returned for a follow-up appointment with  Dr. Stavinoha on June 15, 1995.  (Tr. 87).  Libbey reported occasional reflux symptoms.  (Tr. 87).

Also, the records show that Libbey was referred to Dr. Marvin Chang for an evaluation of his low back pain at the Pain Center.  (Tr. 99-101).  Libbey had his first appointment with Dr. Chang on June 14, 1995. Libbey reported that he was taking Tagamet, Vicodin and Soma.  Dr. Chang also had available the results of a February 1995 MRI, which was normal and an EMG that showed L5-S1 root irritation.  Lumbar films were okay.   The results of Libbey's physical exam revealed that neurologically, his cranial nerves were intact but he had a right L5-S1 sensory deficit to pinprick and temperature sensation in his lower back.  With respect to Libbey's back, Dr. Chang wrote:

The patient had significant right greater than left piriformis tenderness to palpation. He also had midline tenderness to palpation along the L5-S1 area. He had a positive straight leg raising on the right and equivocal straight leg raising on the left. There was no appreciable sacroiliac joint tenderness to palpation or stressing the sacroiliac joint. (Tr. 100).

Based on the objective test results and the exam results, Dr. Chang opined:

At this time even though the history of the patient and clinical findings are consistent with radiculitis with possible disk pathology, his magnetic resonance imaging scan was normal. However, his electromyogram study revealed right greater than left L5-S1 nerve root irritation. Given the fact that his magnetic resonance imaging scan was performed months ago and his symptomatology has worsened since then, I would like to repeat a magnetic resonance imaging scan to see if any further symptoms have developed on magnetic resonance imaging scan. Also, would like to have a repeat electromyogram study before outlining any therapeutic options at this time. (Tr. 100).

At Libbey's July 19, 1995, appointment with Dr. Chang for low back syndrome with bilateral radiculopathy, Dr. Chang noted that the negative results of the repeat MRI were "somewhat puzzling to myself." (Tr. 98). Libbey had another appointment with Dr. Chang on August 7, 1995, at which he was given a lumbar epidural steroid injection. (Tr. 98). The area was re-injected at L5-S1 sacral roots on August 16, 1995. (Tr. 98). As to Libbey's status, Dr. Chang wrote: "doing reasonably well as far as his left radicular component pain in concerned. However, he still has right radicular pain." (Tr. 98). Libbey was next seen by Dr. Chang on September 1, 1995. (Tr. 97). Dr. Chang noted that Libbey had "very significant pain over his right sacroiliac joint area and his right piriformis area." In light of this, Dr. Chang opined: "given the fact that he has no significant disk pathology on his MRI scan, some of his problems may be coming from his sacroiliac joint and he is very tender over this joint and also stressing the joint." (Tr. 97). Libbey's condition was little changed at his September 14, 1995, appointment. Libbey was given a "piriformis injection with psoas compartment block and also a sacroiliac joint block." (Tr. 97). Dr. Chang noted at Libbey's September 20, 1995,

17

appointment that the injection had given Libbey "limited relief" and that he was "very puzzled at this time as what to do." (Tr. 97). Dr. Chang took Libby off Vicodin and it is place prescribed Dilaudid and also prescribed Paxil because Libbey had been "very tearful." (Tr. 97).

Libbey had upper abdominal pain in September 1995. He was seen by Dr. Stavinoha twice, September 21, 1995, and September 26, 1995, for a biliary tract obstruction. (Tr. 859, 860). Libbey returned to Dr. Stavinoha in November 1995. (Tr. 159, 160). Libbey complained of feeling tired all the time, and of upper abdominal discomfort. (*Id.*).

Libbey was not seen again by Dr. Chang until November 22, 1995, for low back pain. According to the treatment note, Libbey's pain was "minimized" on Dilaudid. However, he has noticed an increase in drowsiness. (Tr. 97). Because of the drowsiness, Libbey was taken off Dilaudid and switched to Vicodin. (Tr. 97). Libby returned to a follow-up on December 20, 1995. (Tr. 197).

On February 8, 1996, Libbey had an appointment with Dr. Chang. (Tr. 197). Dr. Chang noted that "the patient continues to do well from his liver disease." Libbey returned a month later, on March 7, 1996, for a follow up for his "chronic back pain secondary to low back syndrome." Dr. Chang characterized Libbey's condition as "status quo." The treatment notes reveals Libbey was going to start interferon treatments for his liver disease. (Tr. 197). At Libbey's June 26, 1996, follow-up office visit with Dr. Chang, Dr. Chang wrote: "doing reasonably well from his overall gastrointestinal status." (Tr. 197). The medical records show that Libbey underwent an outpatient procedure for back pain (medial branch block for facet syndrome), and had an appointment with Dr. Chang on July 16, 1996. (Tr. 196). Dr. Chang wrote: "the patient states he got tremendous relief from his outpatient procedure" and that "he noted a marked diminution in pain; however, it was short

18

lived." (Tr. 196).  Dr. Chang recommended that Libbey undergo radiofrequency thermal coagulation of his medial branches.  Libbey underwent the procedure and was "doing reasonably well" at his August 22, 1996, appointment.  (Tr. 196).  In fact, Libbey reported "significant improvement in his pain and in his upper back."  (Tr. 196).  In addition, Libbey complained that the methadone made him sleepy.  Dr. Chang, in response, prescribed Tylenol #3, and Vicodin.  (Tr. 196).

Similar results were noted by Dr. Chang at Libbey's September 11, 1996, follow-up visit following a medial branch rhizotomy for lumbar facet dysfunction.  "The patient states that his upper back pain was totally eliminated with the procedure.  However, he still has lower back pain."  (Tr. 195).  Again, Libby complained of increased low back pain at his November 6, 1996, appointment with Dr. Chang.  Libbey reported no upper back pain.  (Tr. 195).

On January 3, 1997, Libby was treated by Dr. James Lai because Dr. Chang was unavailable. Dr. Lai noted that Libbey had "some myofascial spasm in the paraspinal muscle bed area.  Palpation of the facet joint in the lumbar region seems to be tender as well."  (Tr. 195).  Libbey returned the following week and was seen by Dr. Chang on January 14, 1997.  (Tr. 194).  Again, Dr. Chang noted that Libbey was "status quo" although now he had right shoulder pain as evidenced by pain to both forced abduction and abduction and a equivocal drop test.  (Tr. 194).  Libbey underwent a MRI of the shoulder, the results of which were available to Dr. Chang at Libbey's January 30, 1997, appointment.  (Tr. 193).  The treatment note reveals that Libbey had a "small anterior lateral tear in his right shoulder.  It also revealed some mild tendinitis and bursitis, and also moderate AC joint arthrosis, but there was no visible impingement noted."  (Tr. 193).  Libbey returned for a follow up appointment on March 26, 1997.  (Tr. 193).  Dr. Chang described Libbey's condition as "status quo." (Tr. 193).  Libbey was not seen again by Dr. Chang until May 23, 1997, at which time he reported

doing "reasonably well" and that his shoulder was improving. (Tr. 193).  Similarly, at Libbey's July 18, 1997, follow up appointment with Dr. Chang for chronic pancreatitis and low back syndrome, he reported that he was "doing well" and "had more energy and has noticed an increase in activity level." (Tr. 192).  Two months later, on September 11, 1997, Libbey reported that he had "a significant return of back pain."  Dr. Chang noted "tender overlying his lumbar facet areas."  Based on this development, Dr. Chang recommended that he repeat rhizotomy injections. (Tr. 192).  The medical records show that Libbey had the lumbar facet rhizotomy recommended by Dr. Chang and he had a follow up appointment on October 21, 1997. (Tr. 192).  Dr. Chang wrote: "I told him at this point I am perplexed as to what to do for him.  He is very concerned about increasing his medication as I am." (Tr. 192).  At Libbey's November 14, 1997, appointment with Dr. Chang, Dr. Chang opined: "I was very discouraged last time because I was unable to burn the appropriate nerve level secondary to muscle innervation continually being stimulated.  We have discussed a stimulator before and I feel that this is the last resort.  His narcotic usage is fairly significant at this point...." (Tr. 191).

The medical records for 1998 reveal that Libbey agreed to participate in a spinal cord stimulator trial at his January 12, 1998, appointment. (Tr. 191).  It was installed and Libbey had his first follow up appointment on January 27, 1998, at which time he reported that he was "doing reasonably well", and with the stimulator increased his activity. (Tr. 191).  Libbey's response was so favorable that at his March 27, 1998, appointment, he requested a permanent placement. (Tr. 190).  However, at Libbey's April 21, 1998, appointment, Libbey reported increased pain. (Tr. 190).  Libbey reported increased pain control at his May 7, 1998, and his May 12, 1998, appointment. (Tr. 189).  Dr. Chang increased the voltage of the stimulator at Libbey's May 26, 1998, appointment and

Libbey, as a result, was able to decrease his narcotic pain medications.  (Tr. 189).  Libbey complained

of abdominal pain at his July 6, 1998, appointment.  (Tr. 188).  Libbey fell and at his July 21, 1998,

appointment, Dr. Chang noted Libbey had "tenderness in his lumbar paraspinous muscle beds, and

he has decreased [range of motion] in his left shoulder along with both cervical and thoracic pain to

palpation."  (Tr. 188).  Libbey was not seen again by Dr. Chang until September 15, 1998, at which

time he complained on abdominal (pancreas) pain and low back pain.  Libbey requested morphine but

Dr. Chang declined and instead prescribed a Duragesic patch.  (Tr. 188).  A week later, on September

22, 1998, Libbey returned and Dr. Chang cautioned:  "I feel that he is taking entirely too much

narcotic..."  (Tr. 187).  Libbey was next seen by Dr. Chang on October 20, 1998, at which time his

condition was "status quo."  (Tr. 187).

The medical records from 1999 show that Libbey continued to be treated by Dr. Chang.  For

instance, at Libbey's January 19, 1999, appointment, Dr. Chang wrote that Libbey was "doing

actually very well" that he had a "very stable dose pattern" and that the "stimulator is significantly

helping his bilateral lower extremity pain."  (Tr. 187).  Libbey was seen four months later, on May

6, 1999.  His condition was "status quo."  (Tr. 186).  Libbey reported "doing fair" at his July 6, 1999,

appointment.  Libbey further reported that he had recently been diagnosed with hepatitis C and had

begun interferon treatment.  (Tr. 186).  Libbey complained of abdominal discomfort at his August

26, 1999, appointment with Dr. Chang but reported that he was "doing reasonable" with respect to

his back.  (Tr. 185, 186).  Libby had no specific complaints and was "doing fairly status quo" at his

October 25, 1999, appointment.  (Tr. 185).  Likewise, at his December 20, 1999, office visit with Dr.

Chang, Dr. Chang wrote that Libbey was "doing fair with overall pain management."  (Tr. 185).

The medical records from 2000 show that Libbey continued to be treated by Dr. Chang.  At

Libbey's February 17, 2000, appointment, Dr. Chang noted that Libbey was "status quo" although Libbey reported his leg was giving way and he had liver problems. (Tr. 184). Dr. Chang again noted that Libbey was "status quo" on April 13, 2000. (Tr. 183). Similarly, Dr. Chang wrote that Libbey was "doing fairly well on his pain management" on June 12, 2000. (Tr. 183). Libbey's appointment of September 7, 2000, and November 6, 2000, were unremarkable and unchanged from June. (Tr. 183).

The medical records for 2001 show that Libbey's condition was unchanged at his January 3, 2001, appointment. (Tr. 181). The battery died in the stimulator in March. (Tr. 181). A new spinal cord stimulator generator was implanted on May 9, 2001. (Tr. 182). Dr. Chang noted that Libbey had good coverage in affect areas on May 16, 2001. (Tr. 184). At Libbey's July 26, 2001, follow up office visit, Dr. Chang noted that Libbey was "fair" and he had increased radicular type pain. (Tr. 181). This continued and at Libbey's September 20, 2001, appointment, Dr Chang noted that Libbey had a "significant aggravation in his pain symptoms" that included numbness and tingling in his lower extremities and weakness. (Tr. 180). Libbey underwent a myelogram, that Dr. Change noted was normal at Libbey's October 8, 2001, appointment. (Tr. 180). Libbey's complaints resolved and he was "status quo" at his December 17, 2001, appointment. (Tr. 180).

Dr. Chang referred Libbey to Dr. Fayan Faiz for evaluation of his neuropathy in his lower extremities on January 23, 2002. (Tr. 180). Dr. Chang noted that Libbey was "status quo" as of February 18, 2002. (Tr. 179). Libbey complained of increased pain in the lower extremities on April 1, 2002. (Tr. 179). However, at his May 30, 2002, and July 23, 2002, appointments, Libbey reported doing "reasonably well." (Tr. 179). Libbey was not seen again by Dr. Chang until September 17, 2002. Dr. Chang noted that Libbey was "doing fair" and that an "EMG confirmed a

demyelinating peripheral neuropathy." (Tr. 178).  Libbey's condition was "status quo" on November 15, 2002.  (Tr. 178).

The medical records from 2003 show that Libbey continued to be treated by Dr. Chang.  At his January 20, 2003, appointment, Dr. Chang noted that Libbey was doing "reasonably well."  (Tr. 179).  Libbey's condition was described by Dr. Chang as "status quo" on March 10, 2003, on May 5, 2003, on July 29, 2003 ( "good benefit from medication"), on September 23, 2003, ("got hepatitis C under control"), and on November 18, 2003. (Tr. 177, 178).  Libbey had an office visit with Dr. Stravinoka on April 28, 2003, for his complaints of fatigue and weight loss.  Libbey denied being depressed.  (Tr. 157).  Libbey returned to Dr. Stavinoha on November 9, 2003, complaining about the side effects of one his prescribed medications.  (Tr. 156).

The medical records for 2004 reveal that Libbey was seen by Dr. Chang on January 13, 2004, at which Libbey reported that the stimulator was no longer working.  (Tr. 176).  Libbey raised similar concerns at his April 5, 2004, and July 13, 2004, appointments. (Tr. 176).  The records further show that Libbey was seen by Dr. Stavinoha on April 20, 2004 (Tr. 155), and July 22, 2004, (Tr. 154).  Dr. Eun Kwun completed a case assessment form on September 13, 2004.  (Tr. 102).  Libbey complained of hepatitis related problems, including diffuse abdominal pain and joint pain at his September 23, 2004, appointment with Dr. Chang.  According to the treatment note, Libbey was doing "fair."  (Tr. 176).  A month later, on October 21, 2004, Dr. Chang noted that Libbey had severe periodontal disease requiring a full mouth extraction.  (Tr. 175).  Libbey was doing "fair" at his December 16, 2004.  (Tr. 174).

The medical records from 2005 show that Libbey continued to be treated by Dr. Chang, who he saw February 10, 2005, (Tr. 173), April 7, 2005 (Tr. 172), June 2, 2005 (Tr. 171), and July 26,

2005 (Tr. 170).  Dr. Chang noted significant changes in Libbey's condition at his October 3, 2003,

appointment.  (Tr. 169).  Libbey had "significant neurologic changes in his bilateral extremities with

numbness and tingling along with plantar flexion weakness and I do not think that this is related to

his neuropathy and is more back related."  As such, Dr. Chang recommended the removal of the

stimulator.  (Tr. 169).  Libbey underwent the procedure and it was removed on November 4, 2005,

and he had a follow up on November 14, 2005.  (Tr. 166-168).   With respect to abdominal pain

complaints, Libbey was treated by Dr. Stravinoka on March 11, 2005.  (Tr. 153).  He underwent an

abdominal ultrasound on March 17, 2005, but because of bowel gas it was of limited value, and a

"distal obstructing lesion" could not be excluded.  (Tr. 151-152).  Libbey was not seen again until

August 30, 2005, at which time his lab work was normal and he was told to return in six months.  (Tr.

150).

        The medical records from 2006 show Libbey was treated by Dr. Chang on January 12, 2006,

for "chronic pain secondary to lumbar disc herniation with radiculitis."  (Tr. 165).  Dr. Chang at

Libbey's February 9, 2006, appointment discussed MRI results.  According to the treatment note, the

MRI showed "facet arthropathy at L3-L4 and L4-L5 main area of pain."  The pain was produced

when Libbey did a lumbar extension and bilateral kemp test with extension.  Dr. Chang opined:  "I

told him that it is very likely that his facets are his pain generator source."  Dr. Chang recommended

a steroid injection.  (Tr. 164).  Libbey underwent the steroid injections on March 3, 2006.  (Tr. 162-

163).  Libbey reported no long term benefit from the facet injection at his March 9, 2006, follow up

with Dr. Chang.  Dr. Chang suggested Libbey consider surgery.  (Tr. 161).

        Libbey testified at the June 6, 2006, hearing.  (Tr. 198-223).  Libbey stated that he has pain

in his lower back, running down his leg.  (Tr. 203).  According to Libbey, lifting or standing

intensifies the pain.  (Tr. 204).  Libbey further testified that he cannot sit.  (Tr. 207).  As to his

medications and side effects, Libbey testified that his medication (muscle relaxer and codeine) makes

him groggy.  (Tr. 208).  With respect to hepatitis C, Libbey stated he was diagnosed in 1995 and had

taken Interferon.  (Tr. 209, 211).

Also testifying was Dr. Talmage, a specialist in pain management, who had treated Libbey for

pain that "never went away.  It was always present and the best times it became moderate but it never

went away.  It was more moderately severe to severe."  (Tr. 213).  With respect to Libbey's

underlying back condition, Dr. Talmage testified:

> Q. — there was – okay.  Well, was there — are your patients typically referred when
> there is not a surgical correction for their condition?
>
> A.  Often times and sometimes we get to evaluate them to see if surgery is needed.
> As I recall, he never had a laminectomy.  I don't think he ever had a severe herniated
> disc problem but he had some discogenic pain.  And when we first saw him, he had,
> you know, marked tenderness over the parasacral nodular areas.  The L4/5 inter space
> was tender.  The sacral nodulars were tender.  Straight leg raising was positive at 80
> degrees bilaterally.  He could get up but he couldn't ---
>
> But the important thing is Dorsey flexion stretch reflex in the raised position was
> strongly positive on the right side and he had a positive Ginslins [phoenetic]
> maneuver, too, which again was accentuated on the right. But deep tendon reflexes
> were present and equal.  My feeling was that — my impression was that he had a
> recent acute lumbar sprain injury with lumbar sacral nerve root irritation and probable
> epidural adhesions, mechanical back pain with with lumbar spondylosis, possible
> chronic cervical sprain injury by history. And we admitted him and had a myelogram
> and CT scan done to follow to rule out a herniated disc.  We didn't find any evidence
> of herniated disc.  Subsequently, the patient underwent epidural procedures with an
> epidural gram showing rather marked epidural adhesions and this was done on
> September 25.  And we found that he had marked epidural adhesions at the –
>
> Q.  Would that have been at the lower part of the back?
>
> A.  The L5/S1 nerve root canal was completely blocked by these adhesions.  That
> causes a pinching of the nerve root and there was–

Q.  Well, now, the condition that you found Mr. Libbey to be in, was that a condition that you recognized as being pain generated?

A.  Yes.  These adhesions are extremely painful and –

Q.  Can that be a painful and debilitating as a herniated disc?

A.  Yes.

Q.  Is there a corrections – is there a way to surgically –

A.  Well, we

Q.  — correct that?

A.  We performed a rats [phonetic] procedure where we – with a rats catheter under direct [inaudible] scopic [phonetic] vision were able to open up some of these scarred areas minimally.  They never opened up all the way.  And then we treated him with neurolytic hypertonic saline epidural injections and we got him some relief, but unfortunately it was only temporary.  And he continued to have a lot of mechanical pain, his extension and so on.  And we subsequently did the zygapophyseal [phonetic] joint injections and we also did radio frequency neurolytic zygapophyseal joint nerve injections on him and [inaudible] we could get temporary relief but he never was able despite continuing physical therapy and medications for muscle spasm and usual adjunctive measures we were never able despite continuing physical therapy and medications for muscle spasm and usual adjunctive measures we were never able to mobilize this patient to a point where he could stay pain free.  So we saw him for a period of time and we did these procedures and like I say, the initial results were satisfactory but he never was able to be mobilized.  We had discussed with him the possibility of having a spinal cord stimulator put in for this type of pain  that he was having and he did not wish to do that.  And subsequently he came under the same care of Dr. Chang, but at the time that I saw him, the last time that I saw him which was in 1990 or '89, you know, early '90, he was really – he was, in fact, disabled by the pain.  He was very depressed.  We had Dr. Royce Watts [phonetic], a clinical psychologist, see him and his situation with the pain and the combination of medicines and not being able to work would be burden [inaudible] placed on him why he was extremely depressed and by his situation.  And he — like I say, didn't come back under my care after that and subsequently went to Dr. Chang.  And –

*                                    *

Q.  Well, now, you have seen Dr. Chang's records.

26

A.  Yes.

A.  Have you not, Dr. Talmage?

Q.  I have.

A.  Do Dr. Chang's findings and treatment correlate with what you had found and what you treated — and the way—

A.  Almost —

Q.  — you treated —

A.  Almost exactly.  His initial history and physical evaluation was almost identical with mine in every respect and subsequent treatments including zygapophyseal joint intervention, repeating those procedures because sometimes those nerves regenerate after you have applied radio frequency current to them.  He did that.  He did – he finally ended up putting a spinal cord stimulator in you as I recall–

Clmt: Yes.

A.  — and that didn't prove to be satisfactory and it was subsequently remove[d], but during this period of time the records that I have received show that he was severely afflicted by the pain of this condition and because of medications and the limitation of his back functions he would have been — he was unable to really to do anything. He couldn't sit.  He couldn't stand.  He couldn't walk.  He had—

Q.  Okay.

A.  —all of the hallmarks of a severe lumbarsacral radiculitis.

Q.  Okay, Dr. Talmage.  Well, now, is it – do you find it unusual for a patient with this condition, with the condition that you found doctor — Mr. Libbey to have, is it unusual for that condition to remain [inaudible] a decade or so?

A.  It's characteristic of it.  It's not unusual at all.  (Tr. 212-218).

In this case, upon this record, there is substantial evidence to support the ALJ's finding that

Libbey's Hepatitis C, chronic pancreatitis or irritable bowel syndrome were not severe impairments

prior to the expiration of his insured status on September 30, 1995.  While the medical records reflect

27

that during the relevant time period, Libbey had abdominal discomfort, Libbey had not demonstrated that, during the time in question, such discomfort substantially limited his ability to engage in basic work activities.

However, with respect to the ALJ's finding that Libbey's chronic back pain was not a severe impairment, substantial evidence does not support the ALJ's step two finding.  Based on the medical evidence, Libbey's testimony and the testimony of Dr. Talmage, Libbey has made a threshold showing that his back condition was something beyond "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect of an individual's ability to work." SSR 85-28, *see also Newell v. Comm'r of Soc. Sec*, 347 F.3d 541, 546 (3rh Cir. 2003) ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step two requirement of 'severe' is met, and the sequential evaluation process should continue."   Here, Libbey's statements regarding the  nature and extent of pain were supported by objective medical evidence.  As Dr. Talmage testified at the hearing, adhesions were painful and while the injections provided *some* relief, Libbey at no time had *complete* pain relief.  The totality of medical records, including those after the expiration of Libbey's insured status, substantiate his pain complaints.  None of the doctors, Dr. Chang or Dr. Talmage, questioned Libbey's need for pain medication. Moreover, while the implanted stimulator, which the ALJ suggested could have remedied Libbey's pain complaints, was initially successful, over time, the coverage it provided diminished and ultimately, it had to be removed.  Overall, the nature of Libbey's treatment history further establishes that his impairment had more than a minimal impact on his ability to do basic work related activities.  Here, Libbey's physical examinations and objective tests corroborate his subjective complaints of low back pain.  For instance, Dr. Bellan, Dr. Talmage, and Dr. Chang all noted that Libbey's straight leg raising

was positive.  EMG test results in 1995 showed L5-S1 root irritation, and by September 17, 2002, showed demyelinating peripheral neuropathy.  While earlier MRI and x-rays were normal, an MRI that was taken February 9, 2006, showed facet arthropathy at L3-L4 and L4-L5, which suggests a deterioration of his condition.  Moreover, Libbey underwent numerous injections recommended by Dr. Talmage and Dr. Chang, all of which provided some relief, but as testified to by Dr. Talmage, failed to provide complete relief from his symptoms.

In sum, substantial evidence supports the ALJ's finding of nonseverity for hepatitis C, chronic pancreatitis or irritable bowel syndrome but substantial evidence does not support the ALJ's nonseverity finding concerning Libbey's complaints of chronic back pain.  Upon this record, substantial evidence does not support the ALJ's step two finding that Libbey has no abnormalities which either alone or in combination, would have such a minimal effect(s) that they would not be expected to interfere with his ability to do basic work activities.  Because Libbey has made a threshold showing that his medically determinable impairment significantly limits his ability to do basic work activities, the ALJ should proceed with the next step in the five step sequential process.  Accordingly, the matter should be remanded to the Commissioner for proceedings consistent with this opinion

.

## VI.  Conclusion and Order

Based on the foregoing, and the conclusion that the ALJ did not properly use the guidelines propounded by the Social Security Administration at step two, and that further development of the

record is necessary, and that based on this infirmity in the ALJ's opinion substantial evidence does not support the ALJ's decision, the Magistrate Judge

ORDERS that Defendant's Motion for Summary Judgment (Document No. 7) is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 6) is GRANTED, and this case is REMANDED to the Social Security Administration pursuant to sentence 4 of 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 26th day of March, 2008.


Frances H. Stacy
United States Magistrate Judge